OPINION
{¶ 1} Appellant, Jesse Driver, III, appeals his conviction on a charge of murder with a firearm specification following his jury trial in the Mahoning County Court of Common Pleas.
 {¶ 2} The jury concluded that Appellant shot and killed Charles Green during the early morning hours of September 1, 2002, in Youngstown, Ohio. Green was an acquaintance of Camille Johnson, who is the mother of Appellant's children. Camille's niece witnessed the shooting. On appeal, Appellant takes issue with several aspects of the underlying proceedings, including the lengthy pretrial delay, his trial counsel's alleged deficiencies, and the weight of the evidence against him. For the following reasons, however, we affirm the decision of the trial court.
 {¶ 3} Appellant asserts four assignments of error. His first assignment of error provides:
 {¶ 4} "The Trial Court Erred When it Denied Appellant's Motion for Discharge for Failure to Afford a Speedy Trial."
 {¶ 5} R.C. § 2945.71(C)(2) provides that an individual charged with a felony: "[s]hall be brought to trial within two hundred seventy days after the person's arrest." R.C. §2945.71(E) also provides that in computing time under divisions (C)(2), "each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." This is commonly referred to as the triple-count provision. If applicable, this triple-count provision requires the state to bring the accused to trial within 90 days after his or her arrest.
 {¶ 6} The speedy trial guarantee is designed, "to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself." State v. Adams (1989),43 Ohio St.3d 67, 68, 538 N.E.2d 1025, quoting United States v. Marion
(1971), 404 U.S. 307, 320, 92 S.Ct. 455.
 {¶ 7} An appellate court is required to independently review whether an accused was deprived of his right to a speedy trial, strictly construing the law against the state. Brecksville v.Cook (1996), 75 Ohio St.3d 53, 57, 661 N.E.2d 706; State v.High (2001), 143 Ohio App.3d 232, 242, 757 N.E.2d 1176.
 {¶ 8} Once a defendant alleges that he is being held in jail only on the pending charges, and then establishes that the state has not brought him to trial within the 90-day limit, he has made a prima facie case for discharge. State v. Butcher (1986),27 Ohio St.3d 28, 31, 500 N.E.2d 1368. The burden then shifts to the state to establish that the defendant was properly held and tried. Id.
 {¶ 9} Appellant claims that he is entitled to the triple-count provision in the instant cause. The state does not dispute this assertion. Thus, the state had 90 days after Appellant's arrest to bring him to trial.
 {¶ 10} Appellant argues that he was not brought to trial within the prescribed time. It is undisputed that more than one year passed after Appellant's arrest and before his trial commenced. R.C. § 2945.72 provides for several ways that the statutory time period can be extended. The state contends he was timely brought to trial after tolling the time attributable to Appellant.
 {¶ 11} Before his jury trial commenced, Appellant sought to be discharged on speedy trial grounds. His request was denied. Appellant now specifically directs this Court's attention to three delays that he claims were unreasonable and resulted in the denial of his speedy trial rights. First, he claims the trial court unreasonably delayed its ruling on his suppression motion. Next, he argues the state's delay in responding to his discovery requests was unreasonable. Finally, he asserts the trial court erred in granting the state a nine-day continuance of the trial.
 {¶ 12} A review of the trial court's record reveals the following: Appellant was arrested on September 13, 2002. While the time for speedy trial begins to run when an accused is arrested, the actual day of the arrest is not counted. State v.Szorady, 9th Dist. No. 02-CA-008159, 2003-Ohio-2716, at ¶ 16. Thus, Appellant's speedy trial time began to run on September 14, 2002.
 {¶ 13} Appellant was subsequently appointed counsel on September 24, 2002, at his arraignment. His jury trial was originally scheduled for November 6, 2002.
 {¶ 14} On November 6, 2002, the trial court sua sponte continued the trial until November 20, 2002, because the court was in the middle of another trial at the time. R.C. § 2945.72(H) permits the tolling of the speedy trial time when a trial court issues a sua sponte continuance as long as the continuance is reasonable. State v. Barker, 6th Dist. No. l-01-1290,2003-Ohio-5417, at ¶ 18. This 15-day continuance was reasonable. Thus, Appellant's time was tolled until November 20, 2002. Appellant's speedy trial time ran from September 14, 2002 until November 6, 2002, for a total of 53 days.
 {¶ 15} Thereafter, on November 20, 2002, Appellant signed a limited speedy trial waiver, specifically waiving the speedy trial time for 30 days. Appellant also sought to continue the November 20, 2002 trial date. His request was granted, and the matter was set for jury trial on December 11, 2002.
 {¶ 16} On December 6, 2002, Appellant filed yet another motion to continue his trial. This request was also granted, and the trial was reset to January 8, 2003.
 {¶ 17} Clearly, Appellant's speedy trial time was tolled as a result of these two continuances from November 20, 2002 until January 8, 2003. Reviewing the previous time which had elapsed, the state had 37 days remaining to bring Appellant to trial at this point.
 {¶ 18} However, on January 7, 2003, Appellant filed his first motion for discovery, a motion for bill of particulars, a motion for disclosure of exculpatory evidence, a motion for intent to use evidence, and a motion to appear in civilian clothing. He also filed a motion to suppress on this date. The trial court again reset the matter for February 6, 2003, based on Appellant's several motions. Any delay necessitated by these motions tolled Appellant's speedy trial time. R.C. § 2945.72. However, it is the amount of time considered reasonable for the state's discovery responses and the trial court's ruling on the motion to suppress that is in dispute.
 {¶ 19} On January 13, 2003, the trial court granted all of Appellant's pending motions except his motion to suppress. Appellant's trial did not take place on February 6, 2003, as scheduled. Instead, the trial court heard the parties' arguments as to Appellant's motion to suppress on this date, and it took the motion under advisement.
 {¶ 20} On February 20, 2003, Appellant filed a motion requesting a copy of the suppression hearing transcript at the state's expense. The trial court granted this motion on March 7, 2003.
 {¶ 21} Thereafter, the trial court granted counsel for Appellant's oral motion to withdraw as counsel on July 11, 2003. Appellant was appointed new counsel on that same date.
 {¶ 22} On August 29, 2003, the trial court overruled Appellant's motion to suppress, which had been heard on February 6, 2003. Appellant asserts that this delay when looked at by itself was unreasonable, and thus, he claims that the delay should not have tolled his speedy trial time.
 {¶ 23} R.C. § 2945.72(E) extends the, "time within which an accused must be brought to trial * * * [for] [a]ny period of delay necessitated by reason of a * * * motion * * * made or instituted by the accused[.]"
 {¶ 24} Appellant directs this Court's attention to the decision in State v. Arrizola (1992), 79 Ohio App.3d 72,606 N.E.2d 1020, in support of this argument. The defendant inArrizola was charged with driving under the influence of alcohol, and he filed a motion to suppress certain evidence. The municipal court judge held a hearing on the motion 16 days later. The court then requested the parties to provide written briefs on the issue. The briefs were filed 14 days later. Thereafter, the municipal court did not rule on the motion to suppress until seven months later. Id. at 73.
 {¶ 25} On appeal, the appellate court concluded that the 228-day delay from the time the motion was filed to the court's ruling was unreasonable and violated Appellant's right to a speedy trial. Id. at 76. In making its decision, the Arrizola
court stressed that the extension of time to rule on a defendant's motion to suppress is subject to a reasonableness requirement. It noted that in assessing reasonableness, a court must review the complexity of the facts and the legal issues involved in a motion as well as the time constraints on a trial judge's schedule. Id. at 76. The Arrizola court concluded that the delay was unreasonable in that case since nothing in the record justified the lengthy delay. Id.
 {¶ 26} As in Arrizola, supra, this Court has also adopted the reasonableness requirement for speedy trial purposes in assessing the delay necessary in ruling on a defendant's motion.State v. Santini (2001), 144 Ohio App.3d 396, 403,760 N.E.2d 442. A balancing test is necessary in which a court should weigh: "[the] [l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Id. at 404, quoting Barker v. Wingo (1972),407 U.S. 514, 530, 92 S.Ct. 2182. A court should also specifically consider the nature of the motion filed and the timing of said motion in assessing whether a delay is reasonable. Santini,
supra.
 {¶ 27} Additionally, this Court in Santini noted that, while a 65-day delay in ruling on a motion to suppress would be reasonable, a seven-month delay would be reaching the extreme limits of reasonableness. Id. at 405, citing State v. Beam
(1991), 77 Ohio App.3d 200, 208, 601 N.E.2d 547. It has also been held that a 141-day delay in and of itself is not necessarily unreasonable. State v. Ritter (1999), 11th Dist. No. 98-A-0065. Further, and depending on the complexity of the facts and legal issues before a court, even a sixteen-month delay in ruling on a motion to suppress could be found reasonable. State v. Deshich
(Jan. 10, 2001), 9th Dist. No. 3054-M, at p. 5.
 {¶ 28} Appellant's motion to suppress in the instant case was filed January 7, 2003. The substance of the motion contained a request that the court suppress all statements made by Appellant. Appellant claimed that his statements to the police were obtained in violation of his constitutional rights and his right against self-incrimination. Specifically, in the motion Appellant asserted that he was not properly advised of his constitutional rights as set forth in Miranda v. Arizona (1996), 384 U.S. 436,86 S.Ct. 1602; that the statement was the result of physical and/or mental duress; that the statement was the fruit of an illegal arrest; and that he did not voluntarily and knowingly waive his right to counsel.
 {¶ 29} As earlier stated, the suppression hearing was held on February 6, 2003, and Appellant subsequently acquired a copy of the suppression hearing transcript. The time between the filing date of the suppression motion and the hearing approximately one month later certainly constitutes a reasonable delay and tolls the time for trial. However, this Court must determine whether the additional 204-day post-hearing delay was reasonable given the facts of this case.
 {¶ 30} Appellant's suppression hearing transcript consists of 32 pages. The hearing centered on whether the state met its burden of proof to ensure that Appellant understood his rights, whether his waiver was validly obtained, and whether his statements were actually voluntary.
 {¶ 31} As in Santini, supra, the motion at issue herein was of "such a nature" that the trial court could not proceed until the motion was decided. Santini, supra, at 405.
 {¶ 32} Also, the trial court had three other motions to address in this case alone after Appellant's suppression hearing was held. Appellant's other motions included: a motion for transcript at the state's expense, his attorney's motion to withdraw as counsel, and Appellant's second set of discovery requests.
 {¶ 33} Additionally, Appellant filed five other motions on the date he filed his motion to suppress, which were granted January 13, 2003.
 {¶ 34} We note that, unlike Arrizola, supra, the instant matter involved allegations of murder with a firearm specification. Arrizola concerned a charge of driving under the influence. Thus, the complexity of the legal issues and consequences were more significant and complex in this case than those involved in Arrizola.
 {¶ 35} We also note that the record is silent as to the status of any other pending matters on the trial court's docket.
 {¶ 36} Unlike Arrizola, supra, the trial court in this case had at least three other pending motions in this case alone at the same time as Appellant's motion to suppress. Further, these other three motions were certainly not the only pending motions on the trial court's docket at the time. In addition, Appellant's motion to suppress raised several issues for the trial court's review. Based on the foregoing, we cannot conclude that the trial court's delay in ruling on Appellant's motion to suppress was unreasonable, as that court knows its docket best. While lengthy, the delay is directly traceable to Appellant. Thus, based on the record here, the trial court's delay in ruling on Appellant's suppression motion was chargeable to him and tolled his speedy trial time.
 {¶ 37} Appellant's motion to suppress was denied on August 29, 2003. Consequently, his speedy trial time began to run on August 30, 2003. At this time, the state still had 37 days remaining for speedy trial purposes. Appellant's case went to trial on September 22, 2003, 24 days after the trial court ruled on his motion to suppress. As such, Appellant was tried within the speedy trial limits.
 {¶ 38} Notwithstanding the foregoing, however, we must still address the state's failure to promptly provide Appellant with the necessary discovery.
 {¶ 39} A discovery request or motion tolls the running of the speedy trial clock since a defendant's discovery requests, "divert the attention of prosecutors from preparing their case for trial, thus necessitating delay. If no tolling is permitted, a defendant could attempt to cause a speedy-trial violation by filing discovery requests just before trial". State v. Brown,98 Ohio St.3d 121, 2002-Ohio-7040, 781 N.E.2d 159, at ¶ 23. However, the delay chargeable to the defendant is only that which is necessitated by the state's response to the discovery requests. Id. at ¶ 4; R.C. § 2945.72(E). The, "rationale supporting the [speedy-trial statute] was to prevent inexcusable delays caused by indolence within the judicial system." (Citation omitted.) Id. at ¶ 24.
 {¶ 40} Appellant initially filed a motion for discovery, a motion for bill of particulars, and a motion for disclosure of exculpatory evidence on January 7, 2003. These motions were granted on January 13, 2003.
 {¶ 41} Thereafter, on July 11, 2003, the trial court allowed Appellant's counsel to withdraw, and it appointed new counsel on that same date. Appellant's new counsel filed another motion for discovery on August 7, 2003, which was sustained on August 11, 2003.
 {¶ 42} On September 4, 2003, Appellant requested discovery sanctions and a hearing since the state had yet to respond to his discovery requests. The trial court held a hearing on September 9, 2003, and it ordered the state to comply by September 11, 2003.
 {¶ 43} The State of Ohio finally provided the requisite discovery on September 11, 2003, approximately eight months after the initial requests. This delay was unreasonable in light of the fact that the local rule requires discovery to be disclosed at pretrial conference. Mahoning C.P. Loc.R. 9. The state's repeated delays in providing the requisite discovery should not toll the speedy trial time. The state's failure in this case, however, ultimately had no effect on Appellant's speedy trial rights, since the time was tolled by his own motion to suppress.
 {¶ 44} Appellant also takes issue with the state's September 12, 2003, motion to continue trial, which was set to begin three days later. The state claimed that the lead investigating detective would be out of the state on that date. Appellant filed a motion in opposition to the continuance. The trial court granted the continuance and reset the trial for September 22, 2003. Appellant claims that the trial court erred in granting this nine-day continuance since the state could have simply had this detective testify last. Even assuming this continuance was granted in error, however, this delay did not exceed Appellant's speedy trial time. As of August 29, 2003, the state had 37 remaining speedy trial days. Thus, the delay had no prejudicial effect.
 {¶ 45} Based on the foregoing, Appellant's first assignment of error lacks merit and is overruled.
 {¶ 46} Appellant's second assignment of error asserts:
 {¶ 47} "The Trial Court Erred in Denying Appellant's Pretrial Motion to Suppress His Statement to the Youngstown Police Department."
 {¶ 48} Pursuant to the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself. Thus, before any custodial interrogation, an individual must be warned that he has a right to remain silent, that any statement he makes may be used against him, and that he has the right to the presence of an attorney during questioning.Miranda v. Arizona (1966), 384 U.S. 436, 444, 86 S.Ct. 1602,16 L.Ed.2d 694. These rights may be waived, provided the waiver is made voluntarily, knowingly, and intelligently. Id.
 {¶ 49} Further, the state has the burden of demonstrating a valid waiver of Miranda rights by a preponderance of the evidence. Tague v. Louisiana (1980), 444 U.S. 469, 471,100 S.Ct. 652, 62 L.Ed.2d 622; North Carolina v. Butler (1979),441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286.
 {¶ 50} It appears from the record that Appellant in this case understood his rights because he executed a Miranda rights waiver. It has been repeatedly held that, "evidence of a written waiver form signed by the accused is strong proof that the waiver is valid." State v. Eley (1996), 77 Ohio St.3d 174, 178,672 N.E.2d 640; State v. Moore (1988), 81 Ohio St.3d 22, 32,689 N.E.2d 1; State v. Dennis (1997), 79 Ohio St.3d 421, 435,683 N.E.2d 1096.
 {¶ 51} However, Appellant claims that he never actually waived his rights despite the fact that he signed a Miranda waiver. Appellant claims that while the evidence at the suppression hearing shows that he understood his rights, it does not show that he waived his rights. Thus, he claims his conviction should be reversed. Appellant bases his argument on his allegation that the state failed to meet its burden of proving that his waiver was validly obtained and that his statements were actually voluntary.
 {¶ 52} In considering a motion to suppress, the trial court assumes the role of trier of fact, and, consequently is in the best position to resolve questions of fact and evaluate witness credibility. State v. Mills (1992), 62 Ohio St.3d 357, 366,582 N.E.2d 972, citing State v. Fanning (1982), 1 Ohio St.3d 19,20, 1 OBR 57, 437 N.E.2d 583. When reviewing a suppression ruling, an appellate court is bound to accept the trial court's findings if they are supported by competent, credible evidence.State v. Guysinger (1993), 86 Ohio App.3d 592, 594,621 N.E.2d 726. Upon accepting the facts as true, the appellate court must independently determine as a matter of law whether the lower court met the applicable legal standard. State v. Klein (1991),73 Ohio App.3d 486, 488, 597 N.E.2d 1141. This should be done without deference to the trial court's decision. Id.
 {¶ 53} Following the suppression hearing, the trial court concluded that Appellant, "made a knowing and intelligent waiver of his rights[,]" and that he, "was aware of both the nature and the consequences of the right, which he abandoned." (Aug. 29, 2003, Judgment Entry.)
 {¶ 54} It has been held that a defendant's indication that he understood his rights combined with his failure to terminate an officer's interrogation shows that the defendant knowingly and voluntarily waived his Miranda rights. State v. Beam (1991),77 Ohio App.3d 200, 203-204, 601 N.E.2d 547.
 {¶ 55} The suppression hearing transcript reveals the following: Youngstown Police Department ("YPD") Sergeant Ronald Rodway was investigating the shooting death of Charles Green. Appellant was identified as a suspect, so Rodway obtained a warrant for his arrest. Appellant subsequently contacted the YPD via telephone. Rodway informed Appellant that there was a warrant for his arrest, and Appellant agreed to appear at the police department to talk with the police. This was the extent of their initial conversation. (Motion to Suppress Tr., pp. 4-6.)
 {¶ 56} Thereafter, Appellant met with Rodway at the station. Rodway testified that he is unsure whether he read Appellant his Miranda rights once or twice. Rodway subsequently tape recorded his interview of Appellant. This videotape was played at the hearing and is before this Court as evidence.
 {¶ 57} The September 5, 2002, videotaped interview reflects that Appellant was initially advised that he must understand his constitutional rights. He was read his Miranda rights, evidently from the waiver form that he subsequently signed. During the reading of his rights, Appellant nodded his head affirmatively six times. The nods of his head occurred after each right was read. Following this oral recitation, Appellant signed the form and acknowledged that he understood his rights. (Sept. 5, 2002, Videotape Interview.)
 {¶ 58} Thereafter, Appellant was read the waiver section of the signed form. Appellant again nodded his head affirmatively several times while the waiver portion was being read, and he indicated that he fully understood his rights. He then signed the waiver section of the form without hesitation. The officer reading Appellant his rights indicated that Appellant seemed to be able to adequately read and write. In response, Appellant said that he had in fact received his GED with honors. Appellant also stated that he was not under the influence of drugs or alcohol. (Sept. 5, 2002, Videotape Interview.)
 {¶ 59} Appellant explained on the videotape that he had contacted the police since he had heard that they were looking for him in connection with a shooting. After being told that there were four witnesses identifying him, Appellant advised the officers that he had been at the Classic Bar on the night in question and had spent the night on his aunt's couch. Appellant also stated that he had been through this process before, which based on the context, evidently meant that he had been interviewed by the police before. Further, Appellant did not seem in any way confused or hesitant in signing the waiver of rights. In fact, he seemed eager to tell his story to the investigating officer. (Sept. 5, 2002, Videotape Interview.)
 {¶ 60} Based on the foregoing, Appellant's September 5, 2002, tape recorded interview reflects that Appellant both understood his rights and voluntarily waived these rights. He signed the waiver form and allowed the interview to continue. Beam, supra. In fact, Appellant initiated the interview. There is absolutely no indication in the record that Appellant did not fully understand or did not waive his Miranda rights. Thus, this assignment of error lacks merit and is overruled.
 {¶ 61} Appellant's third assignment of error asserts:
 {¶ 62} "The Appellant's Convictions and Sentences Are in Violation of the State and Federal Constitutions Because Appellant Was Denied the Effective Assistance of Counsel When Counsel Failed to File a Motion to Suppress Identification Evidence. See, U.S. Const., amend. VI and XIV; Ohio Const., art. I, §§ 1, 2, 10 and 16."
 {¶ 63} Appellant claims that his trial counsel was ineffective in failing to file a motion to suppress eyewitness' testimony. This claim is based on the fact that two eyewitnesses who identified Appellant as the perpetrator did not initially identify him when they first spoke with the authorities.
 {¶ 64} In order to prove an ineffective assistance of counsel claim, a defendant must establish first that his counsel's performance was deficient, and second, that he was prejudiced as a result of counsel's deficiencies. Strickland v. Washington
(1984), 466 U.S. 668, 687-689, 104 S.Ct. 2052, 80 L.Ed.2d 674;State v. Thompson (1987), 33 Ohio St.3d 1, 10, 514 N.E.2d 407.
 {¶ 65} Further, it has been held that the Sixth Amendment right to effective assistance of counsel is not violated by counsel's failure to pursue a motion to suppress unless the claim had merit. State v. Ratcliff (1994), 95 Ohio App.3d 199, 206,642 N.E.2d 31. The mere possibility that a motion to suppress has merit is insufficient to establish the ineffective assistance of trial counsel. State v. Delmonico, 11th Dist. No. 2003-A-0022, 2005-Ohio-2902; State v. Santana (2001),90 Ohio St.3d 513, 739 N.E.2d 798. Instead, courts should employ a "reasonable probability" standard, which is defined as, "`a probability sufficient to undermine confidence in the outcome[,]'" in assessing an ineffective assistance of counsel claim. State v. Bradley (1989), 42 Ohio St.3d 136, 142,538 N.E.2d 373, quoting Strickland at 694.
 {¶ 66} Appellant claims that his trial counsel should have filed a motion to suppress the testimony of Keisha Brock and Shanel Cunningham based on the fact that in their initial accounts of the incident they did not mention Appellant. Thereafter, however, both Keisha and Shanel identified Appellant as the shooter on the night in question.
 {¶ 67} The shooting in question took place in Camille Johnson's driveway. Camille is the mother of Appellant's four children. Keisha and Shanel are Camille's nieces. They were babysitting on the night and early morning of the shooting. Both of the girls testified that they knew Appellant prior to the incident.
 {¶ 68} The following is a summary of Keisha and Shanel's testimony concerning the night in question.
 {¶ 69} In the early morning hours of September 1, 2002, Camille, who had been out for the evening, returned home. Thereafter, Camille was talking on her cellular telephone when the home phone rang. Keisha answered the telephone. Appellant was calling to look for Camille. Keisha told Appellant that Camille was not home, as instructed by Camille. (Tr., pp. 316-317.)
 {¶ 70} Thereafter, a car pulled in the driveway, and Camille advised Keisha that she would be back. Camille went outside. Keisha looked out of the living room window and saw two cars in the driveway. Keisha was looking through the blinds and curtains. One car was behind the other. She could not see inside the cars. She did see Appellant attempting to open the passenger's side door on the first car, closest to the house. Keisha then saw Camille open the passenger side door, and Appellant pulled her out of the car by her arm. (Tr., pp. 320-323.)
 {¶ 71} Keisha saw Appellant leaning into the car through the passenger's side door. Although she did not see a gun, Keisha heard and saw the flash of a gun three times. Camille and Appellant got into the second car and drove away. (Tr., pp. 3243-27.)
 {¶ 72} Keisha later saw the man's head in the first car leaning on the driver's side window. The car had rolled back somewhat into the street. Shanel called 911. Keisha could not call since her hands were shaking. Before the police arrived, Camille called the house and spoke with Shanel. (Tr., pp. 328-329.)
 {¶ 73} Keisha did not identify Appellant as the shooter when the police arrived at Camille's house that morning because she claims she did not know what to say. Instead, she told the 911 operator that she did not recognize the cars or the men in front of her aunt's house. She told the officers the same thing later that same morning at the police station. (Tr., pp. 329, 335-337, 339.)
 {¶ 74} Several days later, Keisha stated she told the police the whole truth because her mom told her it was the right thing to do. This was the first time that Keisha identified Appellant as the shooter. She also identified him as the shooter at Appellant's trial. (Tr., pp. 331, 333.)
 {¶ 75} Shanel likewise testified at trial. She was sixteen years old at the time of trial. She also heard Camille on the telephone, and she heard Camille leave the house at approximately 4:00 a.m. Further, Shanel saw Keisha looking out the living room window when the incident occurred. Shanel heard gunshots, but she did not see the shooting. While Keisha was looking out the window, she told Shanel that Appellant was outside shooting. (Tr., pp. 348, 351-354.)
 {¶ 76} Shanel did not look outside until after the shooting. She saw two people get into a car, but she could not tell who they were. She also saw the first car roll backward into the street. She went outside and saw a man's head leaning on the driver's side window. She called 911. (Tr., pp. 354-358.)
 {¶ 77} Shanel spoke with the police at Camille's house and at the police station later that morning. She did not identify Appellant as the shooter that morning because her Aunt Camille had told her not to when she called the house prior to the arrival of the police. (Tr., pp. 358-360.)
 {¶ 78} Shanel says that she told the whole truth several days later because she was asked to do so by her mother. The whole truth included the fact that Keisha told Shanel that Appellant was outside shooting on the morning in question. Shanel never saw Appellant that morning. (Tr., pp. 360, 373-374, 377-385.)
 {¶ 79} Based on the girls' testimony, Appellant has failed to prove that the claimed motion to suppress would have had merit. Keisha's and Shanel's initial inconsistent statements were before the jury. The jury was able to use this information to judge their credibility as witnesses. In addition, Appellant fails to set forth any reason why the girls would falsely identify him as the shooter. Thus, the fact that they were not forthcoming with the police at first does not undermine confidence in the outcome of Appellant's conviction. The jury was well aware of Keisha's and Shanel's inconsistencies.
 {¶ 80} Based on the above, Appellant has not shown that his counsel's performance was deficient or that he was prejudiced as a result. As such, Appellant's third assignment of error lacks merit and is overruled.
 {¶ 81} Appellant's fourth assignment of error asserts:
 {¶ 82} "Convictions and a Prison Sentence violate U.S. Const. amend. VIII and XIV and OHIO CONST. art. I. §§ 1, 2, 9 and 16 When the Convictions are Against the Manifest Weight of the Evidence."
 {¶ 83} It is well established that, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. MorrisCo. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. "[A]n appellate court may not simply substitute its judgment for that of the trial court so long as there is some competent, credible evidence to support the lower court findings." State, ex. rel. Celebrezze, v.Environmental Enterprises, Inc. (1990), 53 Ohio St.3d 147, 154,559 N.E.2d 1335. Even if the evidence is reasonably susceptible to more than one interpretation, an appellate court must construe it consistently with the lower court's judgment. Karches v.Cincinnati (1988), 38 Ohio St.3d 12, 19, 526 N.E.2d 1350.
 {¶ 84} Appellant was convicted of murder in violation of R.C. § 2903.02(A), with a firearm specification. Appellant now claims that his conviction was against the manifest weight of the evidence since Keisha's and Shanel's eyewitness testimony was contradictory and unreliable.
 {¶ 85} However, although both girls initially failed to identify Appellant as the perpetrator, both identified him several days after the shooting and at the trial. In fact, Keisha testified that she saw Appellant leaning into the victim's vehicle when she heard gun shots and saw the flashes from a gun. (Tr., pp. 324-325.) At this same time, Keisha told Shanel that she saw Appellant outside shooting. Shanel also heard the gunshots. (Tr., pp. 353-354.)
 {¶ 86} As earlier stated, the jury was well aware of the girls' prior inconsistent statements to the police. The jury evidently believed that the girls told the truth at trial. There was nothing before the jury indicating that either Keisha or Shanel had any reason to falsely identify Appellant as the shooter. In fact, Shanel testified that she initially failed to tell the whole truth about the incident because her Aunt Camille, the mother of Appellant's children, told her not to. (Tr., p. 359.)
 {¶ 87} In addition, Camille identified Appellant as the shooter on the night in question. However, Camille testified that the victim, Charles Green, pulled his gun on Appellant first. Thereafter, Appellant pulled his gun out as well. Camille said she heard shots fired from both guns, but that she did not see the shooting since she had her eyes closed. (Tr., p. 541.)
 {¶ 88} Appellant also takes issue with the lack of forensic evidence connecting him to the shooting. Forensic evidence is not required for a conviction. Appellant argues that the physical and forensic evidence that exists in this case is inconsistent with the eyewitness testimony. While there are some inconsistencies between the testimony and evidence, none negates a determination that Appellant shot and killed Charles Green.
 {¶ 89} For example, Youngstown Police Officer Louis Ciavarella, with the YPD crime lab, collected a handgun from the victim's car as evidence, which he identified as a Ruger semiautomatic pistol. Ciavarella also collected four shell casings from the inside of the victim's car. (Tr., pp. 431, 441.)
 {¶ 90} Jonathan Gardner from the Ohio Bureau of Criminal Identification and Investigation, firearms section, also testified for the state. He stated that his lab received a Ruger P93 semiautomatic pistol and four fired casings in connection with this shooting. Gardner examined the casings found at the scene and compared them with several that he fired from the gun. Gardner concluded that three of the four casings were conclusively fired from this Ruger. He also concluded that the fourth casing could have been fired from this gun, but that there were an insufficient number of unique details to be 100% certain about the fourth casing. (Tr., pp. 486, 491, 500.)
 {¶ 91} Appellant claims that since Keisha only heard and saw three gunshots whereas there were four casings found in the victim's car, this supports his argument. He also points to the fact that the coroner testified that there were at least five bullets involved in this shooting, and claims that this inconsistency weighs in his favor. (Tr., p. 483.)
 {¶ 92} The foregoing certainly demonstrates inconsistencies between the testimony and evidence. However, these inconsistencies do not lead to the conclusion that Appellant's conviction is against the manifest weight of the evidence. The number of bullets fired and the number of fired casings found do not contradict Keisha's testimony that she saw Appellant leaning into the victims' car at the time she saw and heard the gun being fired. While Keisha could have been mistaken when she said she heard and saw three shots fired, this does not challenge her identification of Appellant as the shooter. In addition, the investigating officers at the scene could have failed to find the fifth fired casing or the coroner could have been mistaken about the number of bullets involved.
 {¶ 93} Based on the foregoing, Appellant's conviction is supported by competent and credible evidence. As such, his final assignment of error lacks merit.
 {¶ 94} In conclusion, all of Appellant's assignments of error lack merit and are overruled. The judgment of the Mahoning County Court of Common Pleas is affirmed in full.
Vukovich, J., concurs in judgment only.
DeGenaro, J., dissents; see dissenting opinion.